IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| UNITED STATES OF AMERICA, | ) | CR. NO. 07-00299 DAE |
|---|---|---|
| | ) | CR. NO. 08-00128 DAE |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| HAROLD C. SPEAR, III, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING DEFENDANT'S
MOTION TO WITHDRAW GUILTY PLEA

On June 30, 2011 and July 8, 2011, the Court conducted an

evidentiary hearing on Defendant Harold C. Spear, III, M.D.'s ("Defendant")

Motion to Withdraw Guilty Plea.  William L. Shipley, Jr., Assistant U.S. Attorney,

appeared at the hearing on behalf of the Government;[1] Alvin P.K.K. Nishimura,

Esq., appeared at the hearing on behalf of the Defendant.  After reviewing the

motion and the supporting and opposing memoranda, and considering the

testimony proffered at the evidentiary hearing, the Court DENIES Defendant's

Motion to Withdraw Guilty Plea.  (Cr. No. 07-00299, Doc. # 156; Cr. No. 08-

00128, Doc. # 117.)

_____

[1] On June 30, 2011, Darren W.K. Ching, Assistant U.S. Attorney, appeared
for the limited purpose of representing the Government during Mr. Shipley's
testimony.

<u>BACKGROUND</u>

On June 14, 2007, Defendant Harold C. Spear, III, M.D. ("Defendant") was charged in a 20-Count Indictment, filed in the United States District Court for the District of Hawaii, with knowingly and intentionally distributing and dispensing Schedule II controlled substances outside the usual course of professional medical practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). (Cr. No. 07-00299, Doc. # 8.)

On February 29, 2008, Defendant was charged in a 2-Count Information, filed in the United States District Court for the Northern District of Alabama. (Cr. No. 08-00128, Doc. # 1-3.) Count 1 charges Defendant with knowingly, intentionally, and unlawfully dispensing a Schedule III controlled substance outside the usual scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D). (<u>Id.</u> at 1.) Count 2 charges Defendant with criminal forfeiture, pursuant to 21 U.S.C. § 853. (<u>Id.</u> at 2–3.) On March 3, 2008, the parties consented to transfer this case from the Northern District of Alabama to the District of Hawaii, pursuant to Federal Rule of Criminal Procedure 20. (Cr. No. 08-00128, Doc. # 1-2.)

On July 10, 2009, Defendant appeared before former U.S. Magistrate Judge, now U.S. District Judge, Leslie E. Kobayashi, waived his right to

indictment and his right to venue in the Northern District of Alabama with respect to the 2-Count Information, and consented to plead guilty to two felony cases before a U.S. Magistrate Judge, pursuant to a plea agreement with the Government. (Cr. No. 07-00299, Docs. ## 71–72, 75–76; Cr. No. 08-00128, Docs. ## 2–3, 6–8.) In accordance with the plea agreement, Defendant pleaded guilty to Counts 9–12 of the 20-Count Indictment and Count 1 of the 2-Count Information. (See Cr. No. 07-00299, Doc. # 73 ¶ 4; Cr. No. 08-00128, Doc. # 4 ¶ 4.) Defendant also agreed to forfeiture of assets as charged in Count 2 of the 2-Count Information. (See Cr. No. 07-00299, Doc. # 73 ¶ 4; Cr. No. 08-00128, Doc. # 4 ¶ 4.) In return, the Government agreed to dismiss the remaining counts of the 20-Count Indictment after sentencing. (See Cr. No. 07-00299, Doc. # 73 ¶ 4; Cr. No. 08-00128, Doc. # 4 ¶ 4.)

Paragraph 12 of the Plea Agreement provides that the parties dispute, for purposes of sentencing, "[w]hether the conduct set forth in the other counts of the Indictment, that is, those counts as to which the [D]efendant [did] not plead[] guilty, was outside the usual course of professional medical practice and not for a legitimate medical purpose." (Cr. No. 07-00299, Doc. # 73 ¶ 12; Cr. No. 08-00128, Doc. # 4 ¶ 12.) The parties agreed that "if such conduct was outside the usual course of professional medical practice and not for a legitimate medical

purpose, then it would constitute 'relevant conduct' within the meaning of [U.S.S.G. § 1B1.3], and if such conduct <u>was not</u> outside the usual course of professional medical practice and was for a legitimate medical purpose, then it would not constitute 'relevant conduct' within the meaning of [U.S.S.G. § 1B1.3]." (Cr. No. 07-00299, Doc. # 73 ¶ 12; Cr. No. 08-00128, Doc. # 4 ¶ 12.)

The Court accepted Defendant's guilty plea on July 30, 2009. (Cr. No. 07-00299, Doc. # 78; Cr. No. 08-00128, Doc. # 9.) On January 5, 2010, two days before Defendant's sentencing, Defendant made an oral motion to withdraw his guilty plea.[2] (Cr. No. 07-00299, Doc. # 94; Cr. No. 08-00128, Doc. # 60.) In response to the oral motion, the Court vacated Defendant's January 7, 2010 sentencing and referred the matter to U.S. Magistrate Judge Kevin S.C. Chang to set a briefing schedule for the oral motion. On March 1, 2010, Defendant withdrew his oral motion to withdraw guilty plea, and the Court scheduled Defendant's sentencing for April 12, 2010. (Cr. No. 07-00299, Docs. ## 102–03; Cr. No. 08-00128 Docs. ## 66–67.)

---

[2] Defendant's sentencing was originally scheduled for October 26, 2009, but it was subsequently continued on two separate occasions. (Cr. No. 07-00299, Docs. ## 79–80; Cr. No. 08-00128 Docs. ## 31, 33.)

In accordance with the parties' request, the Court subsequently continued Defendant's sentencing four more times and set it for May 26, 2011.[3] (Cr. No. 07-00299 Docs. ## 104–05, 116–17, 127, 131, 133, 141–44; Cr. No. 08-00128 Docs. ## 68–69, 84–85, 96–97, 105–08.)  On May 23, 2011, Defendant filed three documents in connection with his sentencing, namely a Request for Sentence Below the Advisory Guidelines (Cr. No. 07-00299, Doc. # 150; Cr. No. 08-00128, Doc. # 111), a Sentencing Memorandum Regarding Relevant Conduct ("Sent. Mem.," Cr. No. 07-00299, Doc. # 151; Cr. No. 08-00128, Doc. # 112), and a Motion for Downward Departure (Cr. No. 07-00299, Doc. # 152; Cr. No. 08-00128, Doc. # 113).  Defendant's Sentencing Memorandum stated, among other things, that "Defendant's unknowing and unintelligent plea, caused him to waive important constitutional rights, without his knowledge and therefore his plea was not truly knowing and voluntary."  (Sent. Mem. at 3.)

On May 25, 2011, the Court held a telephonic status conference to discuss Defendant's recent filings, which indicated that he may wish to withdraw

---

[3] These continuances are attributable, in part, to the withdrawal and substitution of defense counsel, which occurred on three separate occasions.  (Cr. No. 07-00299, Docs. ## 109, 115, 120, 126, 137–138; Cr. No. 08-00128, Docs. ## 76, 82, 90, 95, 101–102.)

his guilty plea.[4]  During the status conference, Defendant confirmed that he did indeed want to withdraw his guilty plea rather than proceed with the sentencing scheduled for the following day.

On May 26, 2011, immediately before Defendant's sentencing was set to commence, and after both parties' expert witnesses had arrived from the mainland, defense counsel filed a Motion to Withdraw Guilty Plea and orally requested an evidentiary hearing on the motion.  ("Mot.," Cr. No. 07-00299, Doc. # 156; Cr. No. 08-00128, Doc. # 117.)  The Court held a status conference in lieu of the sentencing, during which the Court expressed concern about the vagueness of Defendant's motion, which defense counsel conceded did not include all of the bases for withdrawal.  The Court therefore ordered defense counsel to file a supplement on or before May 31, 2011, setting forth the complete factual and legal basis for the motion.  (Cr. No. 07-00299, Doc. # 158; Cr. No. 08-00128, Doc. # 119.)  When Defendant neglected to file this supplement, and defense counsel failed to contact the Court to request a continuance or explain the reason for its delay, the Court ordered Defendant to file the supplement on or before June 8, 2011.  (Cr. No. 07-00299, Doc. # 159; Cr. No. 08-00128, Doc. # 120.)

---

[4] William L. Shipley, Jr., Assistant U.S. Attorney, appeared at the status conference on behalf of the Government; Alvin P.K.K. Nishimura, Esq., appeared on behalf of Defendant, who was also present telephonically.

On June 7, 2011, Defendant filed a Supplement to the Motion to Withdraw Guilty Plea, setting forth the following six bases for the motion: (1) Defendant told the Court he was not guilty; (2) Defendant's prior counsel failed to properly investigate the case; (3) Defendant's medication, as it was being provided by the Federal Detention Center, was below the prescribed levels, causing Defendant's judgment and functioning to be impaired; (4) Defendant's plea was not voluntary, but was the product of coercion; (5) Defendant was misinformed about the guideline range in this matter by his counsel; and (6) the Court failed to advise Defendant of the nature of supervised release. ("Supp.," Cr. No. 07-00299, Doc. # 163; Cr. No. 08-00128, Doc. # 124.) On June 23, 2011, the Government filed an Opposition to the Motion to Withdraw Guilty Plea. ("Opp'n," Cr. No. 07-00299, Doc. # 165; Cr. No. 08-00128, Doc. # 126.) Defendant did not file a Reply.[5]

On June 30, 2011 and July 8, 2011, the Court conducted an evidentiary hearing on the Motion to Withdraw Guilty Plea.[6] Defendant presented

---

[5] Defendant's reply was due on or before June 27, 2011. (Cr. No. 07-00299 Doc. # 164; Cr. No. 08-00128, Doc. # 125.)

[6] The Court attempted on numerous occasions to set the Motion to Withdraw Guilty Plea for hearing on a date that would be agreeable to the parties. Because the Court's efforts proved unsuccessful, on June 3, 2011, the Court issued an Order setting the Motion to Withdraw Guilty Plea for hearing on June 30, 2011. (Cr. No. 07-00299, Doc. # 159; Cr. No. 08-00128, Doc. # 120.)

Dr. Stephen Kemble, Defendant Harold C. Spear, III, M.D., and Assistant U.S.

Attorney William L. Shipley, Jr.  The Government presented Federal Public

Defender Peter C. Wolff, Jr.

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 11(d)(2)(B) provides that a

defendant may withdraw from a plea of guilty before sentencing if "the defendant

can show a fair and just reason for requesting the withdrawal."[7]  Fed. R. Crim. P.

11(d)(2)(B).  Although this standard is "generous and must be applied liberally," a

---

[7] Rule 11(d) provides:

   (d)   <u>Withdrawing a Guilty or Nolo Contendere Plea</u>. A defendant
may withdraw a plea of guilty or nolo contendere:

      (1)   before the court accepts the plea, for any reason or no
reason; or

      (2)   after the court accepts the plea, but before it imposes
sentence if:

         (A)   the court rejects a plea agreement under Rule
11(c)(5); or

         (B)   the defendant can show a fair and just reason for
requesting the withdrawal.

Fed. R. Crim. P. 11(d).  Here, the Court accepted Defendant's guilty plea on July
30, 2009 (Cr. No. 07-00299, Doc. # 78; Cr. No. 08-00128, Doc. # 9), and Rule
11(d)(2)(A) is not applicable.  Defendant must therefore show a fair and just reason
for withdrawal in accordance with Rule 11(d)(2)(B).

defendant cannot be permitted to withdraw his guilty plea "'simply on a lark.'" United States v. McTiernan, 546 F.3d 1160, 1167 (9th Cir. 2008) (quoting United States v. Hyde, 520 U.S. 670, 676–77 (1997)); United States v. Ensminger, 567 F.3d 587, 593 (9th Cir. 2009) ("[A] change of heart—even a 'good faith change of heart'—is not a fair and just reason that entitles [a defendant] to withdraw his plea, even where the government incurs no prejudice." (citing United States v. Rios-Ortiz, 830 F.2d 1067, 1069 (9th Cir. 1987))). Moreover, a defendant has no right to withdraw his guilty plea, United States v. Alber, 56 F.3d 1106, 1111 (9th Cir. 1995), and the burden is on the defendant to demonstrate a fair and just reason to withdraw from the plea, United States v. Davis, 428 F.3d 802, 805 (9th Cir. 2005); United States v. Ortega-Ascanio, 376 F.3d 879, 883 (9th Cir. 2004); United States v. Nostratis, 321 F.3d 1206, 1208 (9th Cir. 2003). See also Ensminger, 567 F.3d at 594 ("Once the plea is accepted, permitting withdrawal is, as it ought to be, the exception, not an automatic right.").

"'Fair and just reasons for withdrawal include inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea.'" Ensminger, 567 F.3d at 590–91 (quoting United States v. Jones, 472 F.3d 1136, 1141 (9th Cir. 2007)); see also McTiernan, 546 F.3d at 1167 (same).

Statements made during the plea hearing are entitled to a strong presumption of veracity in later attacks on the plea, <u>United States v. Ross</u>, 511 F.3d 1233, 1236–37 (9th Cir. 2008) (citations omitted), and a court may also consider the time elapsed between the entering of such a plea and the defendant's withdrawal request, <u>United States v. Garcia</u>, 401 F.3d 1008, 1013 (9th Cir. 2005) (citations omitted). Ultimately, however, each case must be reviewed in the context in which the motion to withdraw guilty plea arose to determine whether a fair and just reason exists. <u>McTiernan</u>, 546 F.3d at 1167.

## DISCUSSION

For the reasons set forth below, the Court concludes that Defendant has failed to show a fair and just reason for withdrawal of his guilty plea.

I. <u>Adequacy of the Rule 11 Hearing—Factual Basis for Defendant's Plea</u>

Defendant first asserts that, at the change of plea hearing, he indicated that he did not believe he was guilty and that he did not want to plead guilty. (Supp. at 3–5.) Although not entirely clear, Defendant appears to assert that there was an insufficient factual basis for the Court to accept his guilty plea.[8]

---

[8] Defendant's motion and supplement are completely devoid of any case law to support this basis for withdrawal. Most of Defendant's other five grounds for withdrawing his guilty plea are similarly unsupported. Due to the serious nature of the legal issues presented, however, the Court construes Defendant's motion liberally and gives him the benefit of any doubt, even though he is represented by

Federal Rule of Criminal Procedure 11(b)(3) requires that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). To establish this factual basis, the court must determine that "there is sufficient evidence to justify a conclusion that the defendant committed the charged offense." United States v. Reyna-Tapia, 328 F.3d 1114, 1120 n.5 (9th Cir. 2003) (en banc) (citing United States v. Neel, 547 F.2d 95, 96 (9th Cir. 1976) (per curiam)). The court need not be convinced beyond a reasonable doubt of the defendant's actual guilt, instead, "[i]t need only be convinced that there is sufficient evidence to justify the reaching of such a conclusion." Neel, 547 F.2d at 96. "If a defendant enters a guilty plea while continuing to assert his innocence, the district court may accept it if there is 'a strong factual basis.'" Alber, 56 F.3d at 1110 (quoting North Carolina v. Alford, 400 U.S. 25 (1970)). "[T]he court may consider all of the evidence before it at the time of judgment," id. (citation omitted), and there is "no specific method" for establishing the factual basis for a plea, United States v. Rivera-Ramirez, 715 F.2d 453, 457 (9th Cir. 1983); see also United States v. Gaither, 245 F.3d 1064, 1068 (9th Cir. 2001) ("Different judges do this in different ways, and many different ways are proper. Some judges ask the prosecutor for the factual basis, and then ask

_____

counsel.

11

the defendant if what the prosecutor said is true.  Some judges put the defendant

under oath and ask him what he did.  Both are proper, as are others, in appropriate

circumstances." (footnotes omitted)).  For example, "[a]n inquiry might be made of

the defendant, of the attorneys for the government and the defense, of the

presentence report when one is available, or by whatever means is appropriate in a

specific case."  Fed. R. Crim. P. 11(f) advisory committee's note (1974

amendment).

Here, Defendant asserts that he did not believe he was guilty and that

even the Government realized during the Rule 11 hearing that there was no

willingness on his part to plead guilty.  (Supp. at 3–5.)  When reviewed in context,

however, the Government's comment during the hearing does not undermine the

adequacy of the plea colloquy.  Although there may have been some initial

hesitation on Defendant's part, a review of the entire transcript makes clear that

Defendant desired to and did plead guilty.

The portion of the colloquy where Defendant admits his factual guilt

begins as follows:

> JUDGE KOBAYASHI: Tell me what it is that you did on or about
> December 5, 2005, in the State of Hawaii that makes you guilty of
> [Count 9 of the 20-Count Indictment].
>
> THE DEFENDANT: Well, a patient came into my office who had
> been a patient of mine for a number of years and received a written

prescription that was prefilled out by my staff while I was not on the Island.

JUDGE KOBAYASHI: All right.  And was this a prescription for 2,400 milligrams of methadone?

THE DEFENDANT: Yeah, it was for a month's supply and her—her dose was eight pills per day.

JUDGE KOBAYASHI: All right.

THE DEFENDANT: 10 milligram pills.

JUDGE KOBAYASHI: Okay.

THE DEFENDANT: She had been regularly on that medicine, in that dose, every month for a number of years.

JUDGE KOBAYASHI: And do you agree that at the time the prescription was issued you did not conduct a physical examination of the patient nor conduct any medically appropriate tests to evaluate the complaints and symptoms of that patient?

THE DEFENDANT: It wasn't medically indicated, but, yes, that's correct, I did not do that.[9]

JUDGE KOBAYASHI: All right.  And the issuance of the prescription do you agree it was outside the usual course of professional medical practice and not for a legitimate medical purpose?

THE DEFENDANT: Well, we have regulations about—to being face to face for that type of written prescription and most doctors are at

_____

[9] When Defendant stated that a physical examination and tests were not "medically indicated," he was stating that these procedures were not medically necessary.  (See Supp. at 4.)

13

least in the office even if they're not face to face, and I was off island at the time.

JUDGE KOBAYASHI: Okay. So you agree it was outside the professional medical practice?

THE DEFENDANT: Outside the usual way that other doctors do it, correct.

JUDGE KOBAYASHI: All right. And at that time were you a licensed medical physician?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: All right. On or about January 5, 2006, tell me what it is that you did that makes you guilty of that count.

THE DEFENDANT: It's really the exact same thing. You'll notice it's 30 day intervals.

JUDGE KOBAYASHI: Right. And so, you agree to what's stated in—in—in that—

THE DEFENDANT: And then on February 6 another 30 days, and in the—

MR. SHIPLEY: Your Honor, if I could interrupt?

JUDGE KOBAYASHI: Yes.

MR. SHIPLEY: I have a problem with the colloquy as it's been established so far as to the first count. In Dr. Spear's comments there is no willingness on his part to admit that his conduct here is not for a legitimate medical purpose. He is using language to suggest that he still believes that what he did with respect to these patients, although it might have been an atypical practice, he is not conceding that it had no medical purpose.

14

Now, the Government's evidence would show, through the testament—

JUDGE KOBAYASHI: Not that it has no medical purpose, but no legitimate—

MR. SHIPLEY: No legitimate medical purpose.

JUDGE KOBAYASHI: —not for a legitimate purpose.

(July 10, 2009 Tr. at 28:19–25, 29–30, 31:1–5 (emphases added).)  Viewed in isolation, this portion of the colloquy seems to support Defendant's argument. However, after this pause in the hearing, Judge Kobayashi questioned Defendant and he made sufficient admissions.  Judge Kobayashi continued as follows:

JUDGE KOBAYASHI: Let me ask him.  So, Dr. Spear, with regard to each of these, and it's—it's the same patient, apparently; correct?

THE DEFENDANT: Right.

JUDGE KOBAYASHI: All right.  And in the same amount.

THE DEFENDANT: Right.

JUDGE KOBAYASHI: All right.  And in each instance that is set forth in the—in the plea agreement you were not physically in—in the office?

THE DEFENDANT: That's correct.

JUDGE KOBAYASHI: All right.  But the—go ahead.

THE DEFENDANT: One of the reasons this patient stood out was that she had poor documentation of her condition in—in terms of objective findings.

JUDGE KOBAYASHI: Okay.  But what Mr. Shipley has raised is that in order for your guilty plea to be accepted—

THE DEFENDANT: Well, what I'm saying is for any legitimate medical practice for her complaints it would have verified by objective data and in this case I did not do that.

JUDGE KOBAYASHI: All right.  So you agree with the statement—I need to ask you—

THE DEFENDANT: I believe—I believe what she said instead of testing to verify that.

JUDGE KOBAYASHI: Okay.  And was that outside the usual course of professional medical practice and not for—and by—and therefore by giving—permitting the prescription to be given to this patient it was not for a legitimate medical purpose?

THE DEFENDANT: I would say that that's correct.

JUDGE KOBAYASHI: Okay.  You would agree with that?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: All right.

(July 10, 2009 Tr. at 31:5–25, 32:1–12 (emphases added).)  Judge Kobayashi therefore backtracked to ensure that Defendant made sufficient factual admissions to be adjudged guilty as to Count 9 of the 20-Count Indictment, and she did not continue with the colloquy until Defendant twice admitted that this prescription was outside the usual course of professional medical practice and not for a legitimate medical purpose.  After these admissions, Judge Kobayashi continued:

JUDGE KOBAYASHI: So on January 5, 2006; February 6, 2006; and March 3, 2006 [Counts 10, 11, and 12 of the 20-Count Indictment], do you agree that you issued a prescription for 2,400 milligrams of methadone to that same patient?

THE DEFENDANT: That's correct.

JUDGE KOBAYASHI: All right. And you agree that each of those dates when the prescription was issued you did not conduct a physical examination or any medically appropriate test to evaluate that patient's complaints and symptoms?

THE DEFENDANT: That's correct.

JUDGE KOBAYASHI: And do you agree that the issuance of those prescriptions for methadone was outside the usual course of professional medical practice and not for a legitimate medical purpose?

THE DEFENDANT: And I explained that I didn't do the testing that other physicians would have done—

JUDGE KOBAYASHI: Right.

THE DEFENDANT: —which I assume is usual and customary.

JUDGE KOBAYASHI: All right. So that's outside the usual course of medical practice. But do you also agree that these prescriptions were not for a legitimate medical purpose?

THE DEFENDANT: That's correct.

JUDGE KOBAYASHI: And at all times you were a licensed physician; is that correct?

THE DEFENDANT: That's correct.

. . . .

17

JUDGE KOBAYASHI: Okay.  So I'm going to ask you what it is that you did on or about October 7, 2005, in the Northern District of Alabama that makes you guilty of Count 1 of the information.

THE DEFENDANT: Based solely on a telephone evaluation I prescribed medication without a face to face visit or objective data.

JUDGE KOBAYASHI: All right.  And was that—the prescription for 1,000 milligrams of hydrocodone?

THE DEFENDANT: That's right.  It was basically 100 pills for—

JUDGE KOBAYASHI: All right.  And do you agree that by issuing the prescription that was outside the usual course of medical practice and not for a legitimate medical purpose?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: All right.  And that took place in—that—that sale was over the telephone and the—you agree the person on the other side of the telephone was located in the Northern District of Alabama?

THE DEFENDANT: That's right.  Well, I—I had identifying information in terms of a driver's license, a paramedical exam which was like an insurance physical—

JUDGE KOBAYASHI: Okay.

THE DEFENDANT: —and—and based on that information combined with subjective complaints for pain I prescribed, and I would say that that's not a usual and customary medical practice.

JUDGE KOBAYASHI: Right.  But you were here in Hawaii?  Where were you?  Were you in—in Alabama?

THE DEFENDANT: I'm not sure if I was in Florida at the time—

JUDGE KOBAYASHI: Okay.

THE DEFENDANT: —or Alabama. I was—I was back and forth.

JUDGE KOBAYASHI: All right. But you're not disputing that the Northern District of Alabama has jurisdiction over that count?

THE DEFENDANT: I'm not at all—

JUDGE KOBAYASHI: Okay.

THE DEFENDANT: —because the pharmacy was in Alabama.

JUDGE KOBAYASHI: All right. Very good. Okay. Now, as to the colloquy is there anything else you want me to cover with him, and then I'll let you put your statement on the record, Mr. Shipley?

MR. SHIPLEY: No, I—I think—I mean Dr. Spear made admission in it. At least, if nothing more, a characterization fashion, if no necessarily to specific facts that for the purposes of the colloquy I think are—are acceptable.

JUDGE KOBAYASHI: All right. Is there anything that you want to state for the record, Mr. Shipley?

MR. SHIPLEY: Well, Your Honor, there are two things I would like to state.

JUDGE KOBAYASHI: Okay.

MR. SHIPLEY: First of all, that I would ask the Court to—to inquire and confirm that the prescription—Dr. Spear mentioned that his staff issued prescriptions in his absence. In fact, the prescription slips were presigned by him in blank.

JUDGE KOBAYASHI: Yeah, I think that's what he said. I mean I heard him say that.

MR. SHIPLEY: Okay.

JUDGE KOBAYASHI: But—yeah.

MR. SHIPLEY: Just so—he—he basically—

THE DEFENDANT: <u>Before I left the Island, I left unsigned prescriptions, and they followed the protocol that I had set up before. I wasn't</u>—

JUDGE KOBAYASHI: Right. And when you say signed it was—you had signed prescriptions—

THE DEFENDANT: <u>It had an original signature on a prescription pad, yes.</u>

JUDGE KOBAYASHI: <u>But no specific patient was identified nor any specific medication.</u>

THE DEFENDANT: <u>The staff always filled in the patient even when I'm there, but—but</u>—

JUDGE KOBAYASHI: Okay.

THE DEFENDANT: <u>—I was not there.</u>

JUDGE KOBAYASHI: Right.

THE DEFENDANT: Okay.

JUDGE KOBAYASHI: And—and—and the medication wasn't—wasn't—was that filled out?

THE DEFENDANT: The medications at a pharmacy.

MR. WOLFF: No, she's asking if the medication type or amount had been filled in advance or if the—

THE DEFENDANT: Notwithstanding in some cases, I think at that time in—in my practice we were doing that as the patient was there in the office.

JUDGE KOBAYASHI: Okay.  <u>So you signed it blank basically.  I mean these were blank forms.</u>

THE DEFENDANT: <u>That's correct.</u>

JUDGE KOBAYASHI: All right.

(July 10, 2009 Tr. at 32:22–25, 33:1–22, 36:9–25, 37–38, 39:1–24 (emphases added.)

Therefore, although Defendant was ambivalent at the beginning of the plea colloquy, as the colloquy progressed, Defendant readily admitted his guilt on multiple occasions.  Not only did Defendant admit that each of the prescriptions at issue was outside the usual scope of professional medical practice and not for a legitimate medical purpose, but he also admitted that it was his practice to leave presigned blank prescriptions in his office for his staff to fill out in his absence. Defendant argues that in giving his responses, he was "simply doing what his attorney told him to do" (Supp. at 4), but the record of the plea hearing belies this assertion.  Defendant was an active participant in the Rule 11 hearing: he requested clarification when necessary, interjected questions and remarks, and followed the hearing closely.  This evidences that Defendant was not merely parroting responses, but rather that he was paying close attention to each question and the

21

proceedings as a whole. Moreover, as discussed _infra_, Defendant acknowledged several times during the plea colloquy that he was voluntarily entering his plea, that no one pressured or coerced him to plead guilty, and that Mr. Wolff explained to him the charges and consequences of proceeding with the change of plea hearing.

Defendant's assertion that he did not want to plead guilty is further undermined by the fact that he contemplated pleading guilty for more than one year prior to the change of plea hearing. Mr. Wolff testified at the hearing on this matter that Defendant discussed pleading guilty with him in the time leading up to his appointment as defense counsel. Moreover, as discussed _infra_, on March 3, 2008, Defendant consented to transfer the 2-Count Information from the Northern District of Alabama to the District of Hawaii, pursuant to Rule 20 of the Federal Rules of Criminal Procedure. Such a transfer can only be effectuated if the defendant intends to plead guilty to the transferred charges. By consenting to the transfer, Defendant demonstrated that he was intent on pleading guilty at that time.

To the extent that Defendant asserts he is in fact innocent of the charges to which he pleaded guilty, that claim must also fail. As discussed in more detail _infra_, Defendant has not set forth any "newly discovered evidence" of innocence, "intervening circumstances," or a reason to believe he is not guilty "that

did not exist when he entered his plea." See Ensminger, 567 F.3d at 590–91 ("'Fair and just reasons for withdrawal include inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea.'" (quoting Jones, 472 F.3d at 1141)). Defendant cannot now withdraw his plea based on his unsupported claim that he is innocent of the charges to which he pleaded guilty. Moreover, Defendant swore at the change of plea hearing that he was in fact guilty of the crimes to which he pleaded guilty. These statements are presumed true in Defendant's attack on his guilty plea. See Ross, 511 F.3d at 1236–37.

In sum, considering the transcript of the plea hearing as a whole, the Court concludes that Defendant made sufficient factual admissions for his guilty plea to be accepted. Moreover, in the absence of any new information or evidence, Defendant's implication that he is innocent of the crimes to which he pleaded guilty is not by itself a fair and just reason to allow withdrawal of the guilty plea.

II.     Mr. Wolff's Investigation of the Case

Defendant's next claims that Mr. Wolff failed to properly investigate the case in that he failed to obtain the favorable expert opinions of Mark S. Wallace, M.D. until after the Rule 11 hearing. (Supp. at 5–6.)

As discussed, fair and just reasons for withdrawal of a guilty plea include "'inadequate Rule 11 plea colloquies, newly discovered evidence, intervening circumstances, or any other reason for withdrawing the plea that did not exist when the defendant entered his plea.'" McTiernan, 546 F.3d at 1167 (emphasis omitted) (quoting Davis, 428 F.3d at 805). When the defendant asserts newly discovered evidence as the basis for a motion to withdraw guilty plea, it constitutes a fair and just reason for withdrawal if the new evidence "could have at least plausibly motivated a reasonable person in [the defendant's] position not to have pled guilty had he known about the evidence prior to pleading." Garcia, 401 F.3d at 1111–12. In Garcia, the defendant filed a motion to withdraw guilty plea several months after he pleaded guilty, but before he was sentenced, on the basis that he had new evidence from a newly discovered witness. Id. at 1010. The district court denied the defendant's motion, and the U.S. Court of Appeals for the Ninth Circuit reversed because the newly discovered exculpatory evidence "could have at least plausibly motivated a reasonable person in [the defendant's] position not to have pled guilty had he known about the evidence prior to pleading." Id. at 1011–12. Accordingly, the Ninth Circuit vacated the conviction, set aside the guilty plea, and remanded for further proceedings. Id. at 1013–14; see also Davis, 428 F.3d at 807–08 (expounding upon Garcia and applying it to the defendant's

24

claim that his attorney grossly misrepresented his sentencing exposure—a reason for withdrawal "that did not exist when the defendant entered his plea").

The Ninth Circuit tracked its rulings in <u>Garcia</u> and <u>Davis</u> in <u>McTiernan</u>. In that case, the defendant moved to withdraw his guilty plea on the basis that his attorney failed to advise him either prior to or at the change of plea hearing that there was a potential basis for a motion to suppress certain incriminating evidence. <u>McTiernan</u>, 546 F.3d at 1165. The district court did not conduct an evidentiary hearing on the motion, but rather relied on a declaration by the defendant's counsel, which asserted generally that he did not see any grounds for suppression. <u>Id.</u> The district court concluded, based solely on this declaration, that defense counsel had adequately advised the defendant on the topic of possible suppression and denied the defendant's motion. <u>Id.</u> The Ninth Circuit reversed, concluding that under the circumstances, there was "nothing inherently implausible about the proposition that a reasonable person would not have pled and would instead have pursued the motion to suppress." <u>Id.</u> at 1168 (stating that the defendant's burden is to show "that proper advice 'could have at least plausibly motivated a reasonable person in [the defendant's] position not to have pled guilty had he known about the [grounds for suppression now advanced] prior to pleading'" (quoting <u>Garcia</u>, 401 F.3d at 1011–12)). The Ninth Circuit therefore

remanded the case "to enable the district court, after a full evidentiary hearing, to determine whether McTiernan can establish a fair and just reason to withdraw his plea." Id.

In Mayweather, the Ninth Circuit revisited its decision in McTiernan. In that case, the defendant filed a motion to withdraw his guilty plea on the ground that defense counsel failed to adequately prepare his defense by failing to file a motion to suppress the search and seizure that led to the defendant's arrest. Mayweather, 634 F.3d at 502–03. The district court denied the motion to withdraw guilty plea, and the Ninth Circuit affirmed. Id. at 503–07. Distinguishing McTiernan, where "there was a legitimate factual issue as to whether the defendant was advised of the potential suppression issue 'at any time prior to his plea,'" id. at 506 (quoting McTiernan, 546 F.3d at 1167), the Ninth Circuit found in Mayweather that the defendant was aware of the suppression issue prior to his plea. Because the defendant knew about this prior to pleading guilty, the Ninth Circuit concluded that it could not form a basis for the defendant to withdraw his guilty plea. Id.

Similarly, here, Mr. Wolff retained Dr. Wallace to review the medical records of the five patients represented by the 20-Count Indictment and to provide an expert opinion as to whether the controlled substances that Defendant

prescribed to those patients were outside the usual course of professional medical practice and not for a legitimate medical purpose. Contrary to Defendant's assertion, and fatal to this basis for withdrawal, Defendant was informed prior to the Rule 11 hearing that Dr. Wallace's opinions were favorable. Mr. Wolff testified that he first met with Dr. Wallace in January 2009—seven months before Defendant pleaded guilty—and that he discussed with Defendant prior to the guilty plea that Dr. Wallace's opinions were favorable. Defendant himself even acknowledged at the hearing on this matter that he knew prior to the change of plea that Dr. Wallace had a very favorable view of his prescribing.[10] It is therefore

---

[10] Defendant testified as follows:

> MR. NISHIMURA: Now, prior to you actually doing the change of plea on July 10th, were you given any written information about any expert opinions for your case?
>
> THE DEFENDANT: Nothing written. <u>I was told that Dr. Wallace had a very favorable view of all the prescribing, that he felt it was within the realm of professional practice and it was—that it was therapeutic in all the cases.</u> And if anything, hearing that made me—you know, here's a guy that concurs with the fact that I'm—this is pain management I'm doing, I'm not distributing drugs. And that's the truth.

(June 30, 2011 Tr. at 38:7–16 (emphasis added).)

This testimony expressly contradicts the following statements in the Supplement to the Motion to Withdraw Guilty Plea:

undisputed that Defendant knew, prior to pleading guilty, that Dr. Wallace would provide a favorable expert opinion.

Defense counsel emphasizes, however, that Dr. Wallace did not prepare his report until December 30, 2009, and that Defendant first moved to withdraw his guilty plea on January 5, 2010, days after he first saw the report. This argument fails for several reasons. First, contrary to Defendant's assertion, the timing of Dr. Wallace's report is irrelevant provided that, as in <u>Mayweather</u>, Defendant was aware of Dr. Wallace's favorable opinions at the time he pleaded guilty. <u>See</u> <u>Mayweather</u>, 634 F.3d at 506 (denying the defendant's motion to withdraw guilty plea as to the suppression issue because the defendant was aware,

---

[S]ubsequent to the change of plea hearing, [Mr. Wolff] retained an expert, to review and to verify Defendant's conduct was legitimate, with regard to facts pertaining to relevant conduct.

. . . .

Defendant Spear contends that prior counsel should have obtained an expert and an opinion to investigate the legitimacy of Defendant's medical practice and procedures <u>prior to the plea</u>.

. . . .

Because this investigation was not done prior to the plea, the lack of investigation by counsel[] further evidences a lack of a knowing, intelligent plea.

(Supp. at 5–6.)

prior to pleading guilty, of the prospect of making a suppression motion).  Second,

Defendant did not assert Dr. Wallace's favorable opinions as a basis for his

January 5, 2010 oral motion to withdraw guilty plea.  As discussed infra,

Defendant's prior motion "stemmed from a reasonable belief that his rational

thought processes may have been impaired during the time frame of the guilty

plea." (Declaration of Todd Eddins ("Eddins Decl.") ¶ 6; Cr. No. 07-00299, Doc.

# 102; Cr. No. 08-00128, Doc. # 66.)  Defendant never contended, with respect to

his prior motion, that Dr. Wallace's opinions were a basis for withdrawal, and even

if Defendant had so contended, it does not explain why Defendant chose to

withdraw his oral motion to withdraw guilty plea and proceed with sentencing.

(See Cr. No. 07-00299, Doc. # 102; Cr. No. 08-00128, Doc. # 66.)  Third, Mr.

Wolff has provided a plausible explanation for the delay in obtaining a written

report from Dr. Wallace, namely that Dr. Wallace did not write his report until

after Defendant pleaded guilty because the content of the report was dependant on

the disposition of the case.[11]

---

[11] It is also curious that Defendant would move to withdraw his guilty plea
after first reviewing Dr. Wallace's report, because in his report, Dr. Wallace opines
that the four prescriptions charged in Counts 9–12 of the 20-Count Indictment, to
which Defendant pleaded guilty, were "outside the usual course of professional
medical practice and not for a legitimate medical purpose."  (Cr. No. 07-00299,
Doc. # 88 at 15; Cr. No. 08-00128, Doc. # 56 at 15.)  The Court questioned Mr.
Wolff about this inconsistency at the hearing on this matter, and he explained that

In sum, unlike <u>McTiernan</u>, where there was a factual dispute as to whether the defendant was advised of the suppression issue at or before the change of plea hearing, <u>McTiernan</u>, 546 F.3d at 1167, here, both Mr. Wolff and Defendant testified that Defendant knew of Dr. Wallace's favorable expert opinions prior to the Rule 11 hearing. If Defendant was unhappy with Mr. Wolff's failure to obtain a written report from Dr. Wallace prior to the change of plea, or if Defendant no longer wanted to plead guilty after learning of Dr. Wallace's opinions, he should have brought this to Judge Kobayashi's attention. Instead, Defendant stated during the plea colloquy that he was pleased with Mr. Wolff's representation and that he desired to plead guilty. Regardless of whether Defendant is attempting to classify Dr. Wallace's opinions as "newly discovered evidence" or a reason for withdrawal "that did not exist when [Defendant] entered his plea," Defendant's knowledge of Dr. Wallace's favorable opinions prior to the change of plea hearing is fatal to his claim. <u>See</u> <u>Mayweather</u>, 634 F.3d at 506 ("We have never held that [Rule 11(d)(2)(B)] also embraces circumstances known to a defendant at the time of the guilty plea, and we decline to do so now."). Accordingly, Defendant's contention that Mr. Wolff did not retain Dr. Wallace until after the change of plea hearing,

---

Dr. Wallace rendered this opinion as to Counts 9–12 in an attempt to distinguish the counts to which Defendant had pleaded guilty.

which is factually unsupported and wholly unfounded, cannot serve as a basis for withdrawal of Defendant's guilty plea.

III.   Defendant's Medication at the Federal Detention Center

Defendant next argues that his plea was involuntary because he was not receiving the proper dose of lithium when he pleaded guilty and that his thought process therefore may have been impaired when he entered his plea. (Supp. at 7–8.)  This contention is directly contradicted by Defendant's statements at the plea colloquy, Mr. Wolff's testimony, and the declaration of Todd Eddins, Defendant's attorney responsible for investigating and pursuing the January 5, 2010 motion to withdraw guilty plea.

A.   Defendant's Argument and Dr. Kemble's Opinion

This basis for withdrawal stems from the fact that Defendant was incarcerated at the Federal Detention Center ("FDC") at the time he pleaded guilty. On April 24, 2009, Judge Kobayashi revoked Defendant's pretrial release and ordered him to self-surrender to the U.S. Marshals Service on May 13, 2009.  (Cr. No. 07-00299, Doc. # 68.)  Defendant remained incarcerated until September 3, 2009, when the Court reinstated his pretrial release.  (Cr. No. 08-00128, Doc. # 27.)  Defendant's psychiatrist, Stephen B. Kemble, M.D., testified at the hearing on this matter that Defendant suffers from bipolar disorder, or manic depressive

illness, for which he prescribes mood stabilizers.  Dr. Kemble last saw Defendant before his incarceration in January 2009, and at that time, he was prescribing Defendant 150 milligrams lamotrigine twice a day and 450 milligrams lithium twice a day.  When Defendant was incarcerated, FDC requested information from Dr. Kemble regarding Defendant's medication levels, and although Defendant did not receive any medication for his first few weeks at FDC, once they received the information from Dr. Kemble, they started Defendant on 300 milligrams lithium twice a day.  Defendant subsequently requested that his lithium level be increased, and on June 30, 2009, FDC raised it to 900 milligrams a day (600 milligrams in the morning and 300 milligrams in the evening), the dose that Dr. Kemble had prescribed to Defendant before his incarceration.

Defendant asserts that his medication at FDC was below his prescribed levels, and that this calls into question the propriety of his guilty plea, but Defendant had been receiving his preincarceration dose of lithium for ten days before the July 10, 2009 change of plea hearing.  Dr. Kemble even testified that by July 5, 2009, five days before the change of plea hearing, Defendant was probably in the mid-therapeutic range based on what the blood levels showed when Defendant was on different doses in the past.  Although Dr. Kemble also opined that the lithium "may not" have achieved full efficacy until "somewhere between 1

and 3 weeks" after June 30, 2009, when Defendant reached the 900 milligrams a

day dose, Dr. Kemble acknowledged that he could not make a judgment as to

whether Defendant was in fact manic when he entered his guilty plea. According

to Dr. Kemble, such a judgment would necessarily have to be based on

observations at the time in question, and it is undisputed that Dr. Kemble did not

see Defendant between January 2009 and November 2009.[12]

---

[12] The following exchange took place during the hearing on this matter:

MR. NISHIMURA: Okay. Now, even if he gets the 900 milligrams
per day—

DR. KEMBLE: Yes.

MR. NISHIMURA: —which you indicated, does that prevent Dr.
Spear from having episodes of these conditions?

DR. KEMBLE: <u>Even when the lithium levels are therapeutic you can
still get some breakthrough manic symptoms.</u> Control is rarely
complete. So it would be quite possible he would be still somewhat
manic. <u>It would need to be based on observations at the time to
evaluate that.</u>

MR. NISHIMURA: Okay.

DR. KEMBLE: You can't tell just from the lithium level.

MR. NISHIMURA: Okay. But—

THE COURT: <u>So you would not be in a position to make a judgment
on that?</u>

33

Dr. Kemble's letter in support of Defendant's Motion to Withdraw Guilty Plea is similarly unpersuasive. In the letter, Dr. Kemble states: "If [Defendant] was not having his mood and lithium levels monitored closely while in the FDC, he <u>could</u> have become manic[,] and in that event[,] his lithium dose <u>would likely</u> have become inadequate for his manic state." (Supp. Ex. B at 1–2 (emphases added).) This opinion simply does not assist the Court in determining whether Defendant's guilty plea was involuntary, particularly because Dr. Kemble concedes that he "did not see [Defendant] during the time he was in the FDC or near the time when he made his plea agreement." (<u>Id.</u> at 1.) Dr. Kemble therefore cannot state to any degree of medical certainty whether Defendant's judgment was impaired when he entered his guilty plea.[13]

B.     <u>Defendant's Testimony at the Change of Plea Hearing</u>

Defendant's claim of involuntariness is further belied by his statements at the change of plea hearing. The following exchange took place:

DR. KEMBLE: <u>That's correct.</u>

(June 30, 2011 Tr. 15:3–17 (emphases added).)

[13] Dr. Kemble also emphasized that Defendant was more likely to become manic when he was at FDC because he went a few weeks without medication. Although the Court considers this opinion, it is of limited utility because Dr. Kemble cannot state with any degree of certainty whether Defendant was suffering from impaired judgment either in the time leading up to, or at, the change of plea hearing.

JUDGE KOBAYASHI: Have you taken any medication, alcohol, or drugs of any kind today?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: What types of medication, alcohol, or drugs have you taken?

THE DEFENDANT: Lisinopril, lamotrigine, and lithium.

JUDGE KOBAYASHI: All right. And these are all prescription medications; is that correct?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: And these are all to assist you with medical conditions that you might have?

THE DEFENDANT: One medical; two psychiatric.

JUDGE KOBAYASHI: All right. And are there any side effects of these prescription medications that you take that would make you unable to understand or make decisions today?

THE DEFENDANT: No.

JUDGE KOBAYASHI: All right. <u>Are you feeling well, and alert, and able to understand what's going on?</u>

THE DEFENDANT: <u>Yes.</u>

JUDGE KOBAYASHI: And have you been treated recently for any type of mental illness, or addiction to narcotic drugs of any kind?

THE DEFENDANT: No addiction.

JUDGE KOBAYASHI: All right. And then you're under a doctor's care for a psychiatric condition?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: All right.  Counsel, to the best of your knowledge, is your client fully competent to enter a valid plea today?

MR. WOLFF: Yes.

JUDGE KOBAYASHI: The Court so finds.

(July 10, 2009 Tr. at 5:9–25, 6:1–14 (emphases added).)  Defendant testified at the hearing on this matter that, after taking lithium for many years, he can recognize "more or less" when it is not giving him the level of relief that he needs.  This acknowledgment, coupled with Defendant's June 2009 request that FDC increase his lithium dose, bolsters Defendant's affirmation during the change of plea hearing that he was feeling well, alert, and able to understand the proceedings.  Indeed, this demonstrates not only that Defendant, himself a medical doctor, is "more or less" able to recognize when his lithium level should be adjusted, but also that when he feels that an adjustment was necessary, Defendant requests additional medication.  If Defendant felt that his judgment was impaired at the time he changed his plea, he could have brought that matter to Judge Kobayashi's attention.  Defendant instead affirmed that he felt "well, alert, and able to understand" the proceedings, which is entitled to a presumption of veracity in this attack on Defendant's guilty plea.  Ross, 511 F.3d at 1236–37 (stating that

statements made during a change of plea hearing are entitled to a strong presumption of veracity in later attacks on the plea).

Moreover, a review of the transcript of the change of plea hearing confirms that Defendant was alert, engaged, and had a clear understanding of the proceedings. Defendant responded to the questions asked of him, requested clarification when necessary, and indicated that he understood the charges to which he was pleading guilty and the consequences of pleading guilty. Moreover, Mr. Wolff, who has had extensive experience interacting with Defendant, testified that he did not see anything on the date of the change of plea hearing to indicate that Defendant was manic or depressive. Although Mr. Wolff acknowledged that Defendant was more subdued when he was in custody, he nonetheless stated that Defendant did not lack focus and that Defendant did not express reluctance or misgivings about pleading guilty until the months after the change of plea hearing.

C.    Mr. Eddins's Declaration

Mr. Eddins's declaration also reinforces the determination that Defendant's plea was knowing and voluntary. As discussed, on January 5, 2010, two days before Defendant's sentencing, Mr. Wolff made an oral motion to withdraw guilty plea on Defendant's behalf. Because Mr. Wolff believed it may be a conflict of interest for him to continue to represent Defendant while he attempted

to withdraw his guilty plea, the Court appointed Mr. Eddins to pursue the motion. (See Cr. No. 07-00299, Doc. # 96; Cr. No. 08-00128, Doc. # 62.)  On March 1, 2010, however, rather than file a memorandum in support of the oral motion, Mr. Eddins filed a notice of withdrawal of oral motion to withdraw guilty plea.  (Cr. No. 07-00299, Doc. # 102; Cr. No. 08-00128, Doc. # 66.)  In the declaration in support of the notice of withdrawal, Mr. Eddins stated as follows:

> 9.  Upon his post-plea release from the FDC, Spear resumed psychiatric and medical care, including his prior medication regimen.  Spear's treating physicians believed that he may have been impaired when he entered his guilty pleas.  Thereupon, Spear became concerned about the propriety of his plea.
>
> 10.  Through his oral motion to withdrawal guilty plea, Spear sought an exploration into the legal issues surrounding his guilty plea.
>
> 11.  Spear's extensive medical records were furnished to counsel.  Counsel received court approval for the appointment of a forensic expert, Dr. Marvin Acklin.
>
> 12.  I canvassed the legal landscape with respect to the issues presented by Spear's withdrawal of guilty plea.  The case law and legal analysis surrounding FRCP Rule 11, a defendant's competency to plea guilty, and the voluntary and intelligent nature of a plea were exhaustively reviewed.  The records and files in the case, particularly the transcript of the July 10, 2009 proceedings, were also reviewed.
>
> 13.  I briefed the pertinent issues presented by the motion, and shared the analysis with Spear.  A few days ago, Spear met with Dr. Acklin.

> 14. Spear's fears have abated. As a medical doctor he possessed certain notions as to impairment and proper functioning, which differed from legal standards and principles. <u>Spear now fully understands that while he may not have mentally and physically functioned at his normal, optimal level, his plea was legally valid.</u>

(Eddins Decl. ¶¶ 9–14 (emphasis added).) Mr. Eddins—Defendant's attorney in his prior motion to withdraw guilty plea—therefore determined, after reviewing the relevant evidence and case law and obtaining an expert opinion, that Defendant's guilty plea was legally valid. Mr. Eddins's declaration also indicates that Defendant himself agreed with this conclusion. Accordingly, Defendant's renewed attempt to withdraw his guilty plea, immediately before sentencing, on this basis, which he has already explored with both a forensic expert and prior counsel, is unpersuasive.

D.    The Rule 20 Transfer

Defendant's actions before the change of plea hearing further undercut his argument that his guilty plea was involuntary. As discussed, on March 3, 2008, sixteen months before the change of plea hearing in this case, Defendant consented to transfer the 2-Count Information from the Northern District of Alabama to the District of Hawaii, pursuant to Rule 20 of the Federal Rules of Criminal Procedure. (Cr. 08-00128, Doc. # 1.) Because Rule 20 provides for the transfer of federal criminal proceedings solely for the purpose of pleading guilty and imposing a

39

sentence,[14] see Fed. R. Crim. P. 20; see also United States v. Wickham, 30 F.3d

1252, 1253 (9th Cir. 1994) (noting that the Rule 20 transfer at issue occurred after

the defendant decided to plead guilty to the transferred charges); United States v.

Roberts, 618 F.2d 530, 542 (9th Cir. 1980) (Wyatt, D.J. , dissenting) ("[Rule 20]

---

[14] Rule 20 provides, in pertinent part, as follows:

(a)     Consent to Transfer. A prosecution may be transferred from the
        district where the indictment or information is pending, or from
        which a warrant on a complaint has been issued, to the district
        where the defendant is arrested, held, or present if:

        (1)     the defendant states in writing a wish to plead guilty or
                nolo contendere and to waive trial in the district where
                the indictment, information, or complaint is pending,
                consents in writing to the court's disposing of the case in
                the transferee district, and files the statement in the
                transferee district; and

        (2)     the United States attorneys in both districts approve the
                transfer in writing.

. . . .

(c)     Effect of a Not Guilty Plea. If the defendant pleads not guilty
        after the case has been transferred under Rule 20(a), the clerk
        must return the papers to the court where the prosecution began,
        and that court must restore the proceeding to its docket.  The
        defendant's statement that the defendant wished to plead guilty
        or nolo contendere is not, in any civil or criminal proceeding,
        admissible against the defendant.

Fed. R. Crim. P. 20.

provides for a transfer of an indictment where a defendant, 'arrested, held or present' in another district, wishes to plead guilty in that district where he has been arrested or is held or is present."), Defendant must have contemplated pleading guilty in March 2008, when he signed the consent to transfer form. Although a defendant can decide to plead not guilty after consenting to a Rule 20 transfer, <u>see</u> Fed. R. Crim. P. 20(c), Defendant's consent to transfer here nonetheless shows that he did not make a rash decision to plead guilty while he was suffering from an impaired mental state. To the contrary, Defendant's guilty plea was the product of more than sixteen months of planning and preparation. Moreover, if Defendant truly was suffering from impaired judgment when he pleaded guilty, he would have moved to withdraw his guilty plea immediately following his release from FDC, when his medication was purportedly better regulated. Instead, Defendant waited until two days before his January 7, 2010 sentencing to move to withdraw his guilty plea. This chronology, which demonstrates that Defendant contemplated pleading guilty sixteen months before his guilty plea, causes the Court to seriously question the veracity of Defendant's claim that his judgment was impaired at the change of plea hearing, causing his plea to be involuntary.

E.  Relevant Ninth Circuit Case Law

Finally, the pertinent Ninth Circuit case law supports the determination that Defendant's guilty plea was not tainted by his alleged impaired judgment.  In a recent published opinion, the Ninth Circuit affirmed a district court's order denying the defendant's motion to withdraw guilty plea when the defendant claimed that his plea was involuntary because he "'suffer[ed] from undetermined psychological problems and . . . did not understand and was not capable of understanding the plea agreement." Briggs, 623 F.3d at 727–28.  The Ninth Circuit emphasized that although the defendant had an IQ of 70, a psychological evaluation found that he had the capacity to make a knowing decision about his plea.  Id. at 728.  The defendant discussed in detail with the psychiatrist his own calculation of the sentence he faced, the good behavior time he expected to accrue, and the ultimate period of incarceration that would result, all of which indicated that the defendant understood the consequences of pleading guilty. Id.  The Ninth Circuit also determined that the transcript of the plea colloquy, in which the defendant admitted to factual allegations, asked questions, and indicated that he was satisfied with his lawyer's representation, was "strong evidence" that the defendant understood the meaning of his actions.  Id. (citing Ross, 511 F.3d at 1233).  The Ninth Circuit therefore affirmed the district court's order, concluding

that "[the defendant's] true complaint is not that he lacked the capacity to understand his guilty plea, but that he misunderstood the severity of the sentence that he faced." Id. at 727–28; see also Nostratis, 321 F.3d at 1208–11 (affirming the district court's denial of the defendant's motion to withdraw guilty plea when the defendant claimed that he did not understand English well enough to comprehend the terms, conditions, and consequences of his plea agreement and, therefore, he did not knowingly and intelligently enter into the agreement, but there was ample evidence that the defendant could speak and understand English).

Here, as in Briggs, there is absolutely no evidence that at the time Defendant pleaded guilty, his judgment was impaired; rather, Defendant fully understood the nature of the change of plea hearing and the gravity of the decision to plead guilty. In fact, Defendant carefully considered whether to plead guilty for more than one year before the Rule 11 hearing. On the facts and evidence presented, the Court simply cannot conclude that Defendant's guilty plea was influenced by impaired judgment. Accordingly, Defendant will not be permitted to withdraw his guilty plea on this basis.

IV.     Alleged Coercion by Mr. Wolff

Defendant's fourth claim, that Mr. Wolff pressured him to plead guilty, such that his guilty plea was involuntary and coerced, (see Supp. at 9), is also unproved and unfounded.

The following exchange took place during the Rule 11 hearing:

JUDGE KOBAYASHI: Have you received a copy, Dr. Spear, of the indictments pending against you, that is the written charges against you in both cases?

THE DEFENDANT: Yes, I have.

JUDGE KOBAYASHI: All right.  Have you fully discussed those charges and all the facts surrounding those charges with your lawyer, Mr. Wolff?

THE DEFENDANT: Ad nauseaum, yes, I have.

JUDGE KOBAYASHI: All right.  And have you been fully satisfied with the legal representation that you received from Mr. Wolff?

THE DEFENDANT: Yes, I have very much so.

JUDGE KOBAYASHI: And, Mr. Wolff, are you and your client in agreement as to his decision to plead guilty pursuant to the plea agreement?

MR. WOLFF: Yes.

(July 10, 2009 Tr. at 6:19–25, 7:1–9 (emphases added).)

JUDGE KOBAYASHI: Has anyone attempted to force you to plead guilty, or to pressure you, or threaten you in any way?

THE DEFENDANT: <u>No.</u>

(July 10, 2009 Tr. at 11:6–8 (emphases added).)

These statements, made under oath during the plea colloquy are entitled to a strong presumption of veracity, <u>Ross</u>, 511 F.3d at 1236–37, and severely undercut Defendant's claim that Mr. Wolff coerced or threatened him to plead guilty. Defendant reiterated at the January 5, 2010 status conference that he was very pleased with Mr. Wolff's representation:

> THE COURT: Now, does Dr. Spear want you [Mr. Wolff] to withdraw as his counsel? Is he happy with you as his counsel? I mean I don't know.
>
> MR. WOLFF: I think he's more or less happy with me. I mean I think he basically is happy with me.
>
> THE COURT: <u>Do you want him to withdraw as counsel?</u>
>
> THE DEFENDANT: <u>No, sir. I'm satisfied with my representation</u> and I—I feel that there is a considerable amount of vacillation on my part on taking the plea in the first place.
>
> THE COURT: Well—
>
> THE DEFENDANT: And—
>
> THE COURT: We'll get into that later, Dr. Spear, but what I'm trying to determine now is whether—
>
> THE DEFENDANT: <u>I've been satisfied with my representation by Mr. Wolff.</u>
>
> THE COURT: All right.

(Jan. 5, 2010 Tr. at 7:14–25, 8:1–5 (emphases added).)

At the hearing on this matter, Mr. Wolff testified in detail about his investigation of the case and his tactical decisions as well as his discussions with Defendant regarding Defendant's decision to plead guilty. Admittedly, Defendant was at times ambivalent about pleading guilty, and he went back and forth so much on the issue that Mr. Wolff told Defendant he would not engage in plea discussions with the Government until Defendant stated in writing that he wanted to plead guilty. Mr. Wolff also told Defendant, however, that he was willing to defend the case factually and go to trial if that was what Defendant wanted. Mr. Wolff testified in great detail at the hearing on this matter about his discussions with Defendant regarding the benefits and drawbacks of pleading guilty. Although Mr. Wolff was candid with Defendant, and told him that he should seriously consider pleading guilty, Mr. Wolff's opinion was grounded in his appraisal of the facts and issues involved in the case.[15] Such advice does not rise to the level of coercion,

---

[15] Mr. Wolff testified, for example, that even if Defendant did not plead guilty to the District of Hawaii charges, problems would arise with the Northern District of Alabama case, which had been formally transferred, pursuant to Rule 20, for the purpose of Defendant pleading guilty. Mr. Wolff explained that if Defendant pleaded guilty to the Alabama charges, but went to trial on the Hawaii charges, the guilty plea could be used to impeach Defendant if he decided to testify at the trial. Mr. Wolff was also concerned that, if Defendant decided not to plead guilty to the Alabama charges, those charges could not be defended factually because Defendant had been debriefed in Alabama and made several statements

particularly because Mr. Wolff assured Defendant that he would proceed to trial if that was what Defendant desired.

Defendant asserts that Mr. Wolff met him on the morning of the change of plea hearing, and when he expressed doubt about pleading guilty, Mr. Wolff "yelled at and verbally assaulted" Defendant, using "profanities and intimidating language." (Supp. at 9.) Mr. Wolff's testimony on this point expressly contradicts Defendant's contention. Moreover, although Mr. Wolff could not specifically remember his conversation with Defendant before the Rule 11 hearing, Mr. Wolff testified that if Defendant had told him he did not want to plead guilty, he would have cancelled the Rule 11 hearing and gone to trial. Mr. Wolff also testified, however, that Defendant never told him he did not want to go forward with the change of plea hearing. Mr. Wolff stated that it is fairly common for people to have misgivings about pleading guilty and that he never threatened to withdraw if Defendant did not follow his advice. The Court accepts Mr. Wolff's statements about the nature of his relationship with Defendant.

---

that could be used against him. According to Mr. Wolff, the Alabama charges and the Hawaii charges were very similar in a troubling way, and even though Dr. Wallace rendered a favorable opinion, this would not help with the problems associated with the Alabama case.

Moreover, the record shows that Defendant was not coerced to plead guilty, but instead was given ample time to consider his prospective guilty plea. Mr. Wolff testified that, although Defendant did not actually plead guilty until July 2009, Defendant discussed pleading guilty with him in the months leading up to his May 2008 appointment as Defendant's counsel. Additionally, it was Defendant's prior counsel—not Mr. Wolff—who negotiated the terms for the Rule 20 transfer of the Northern District of Alabama charges, as Defendant implicitly acknowledged during the Rule 11 colloquy:

> JUDGE KOBAYASHI: So do you wish to give up, that is waive your right to indictment, and agree to proceed on the charges as stated in the information in the Northern District of Alabama case?
>
> THE DEFENDANT: Yes.
>
> JUDGE KOBAYASHI: All right. And, Mr. Wolff, did you go over the waiver of indictment with your client and are you fully assured that he understands it?
>
> MR. WOLFF: Yes, I am, Your Honor. And just for the—a point of clarification for the record.
>
> JUDGE KOBAYASHI: Yes.
>
> MR. WOLFF: <u>That whole aspect of the case was worked out during a period of time when Dr. Spear was being represented by private counsel, but he subsequently was unable to continue with private counsel. And so, we've talked about it, but the original understanding between him and the United States Attorney in Alabama was worked out without my involvement at all.</u>

JUDGE KOBAYASHI: All right.

THE DEFENDANT: <u>You want to know the private attorney's name or does it matter?</u>

JUDGE KOBAYASHI: <u>No, I think we have that as a matter of record.</u> So what I'm beginning to understand from Mr. Wolff is discussions and agreements were worked out before he took over representation; however, he has reviewed it, and he's gone over with you what it means to waive indictment.

MR. WOLFF: Yes, I—I don't have any quarrel with what was worked out in—in respect to the Alabama case. I think it was an appropriate resolution. I just wanted the record here to reflect that it was done before I actually got involved in the case.

JUDGE KOBAYASHI: Okay. But you signed—also signed the waiver of indictment form—

MR. WOLFF: Yes.

(July 10, 2009 Tr. at 8:23–25, 9:1–25, 10:1–6 (emphases added).) This demonstrates that Defendant contemplated pleading guilty well before Mr. Wolff represented him because, as noted, a Rule 20 transfer can take place only if the defendant plans to plead guilty to the transferred charges.

In sum, Defendant's testimony lacked credibility and the Court found Mr. Wolff to be highly credible as to Defendant's desire to plead guilty. Based on the record, there is no doubt that Defendant wanted to plead guilty and that his decision to do so was informed and voluntary. Defendant therefore has not met his burden of showing that Mr. Wolff threatened and coerced him into pleading guilty,

49

rendering his plea involuntary. Accordingly, this cannot form the basis of a fair and just reason to permit Defendant to withdraw his guilty plea.

V.     Defendant's Sentencing Exposure

Defendant next argues that Mr. Wolff misinformed him about the guideline range in this matter. (Supp. at 9–10.) It is well-established that an erroneous prediction by a defense attorney concerning sentencing generally does not entitle a defendant to withdraw his guilty plea. Garcia, 909 F.2d at 1348; Briggs, 623 F.3d at 728 ("We have previously expressed skepticism at the proposition that a defendant may change his plea solely because he underestimated the severity of the sentence he faced.").

The Ninth Circuit has recognized a limited exception to this rule when there has been a "gross-mischaracterization" of the likely outcome in the case. Davis, 428 F.3d at 805; see also Briggs, 623 F.3d at 728–29 (citing Davis and stating that defendants may withdraw their guilty pleas based on an underestimation of the defendant's sentencing exposure only in "exceptional circumstances"). In Davis, defense counsel told the defendant that his potential sentencing range was probation to eight years, and the defendant believed, based on his attorney's advice, that if he pleaded guilty, he would receive probation. Davis, 428 F.3d at 805. The district court found that defense counsel grossly

mischaracterized the defendant's possible sentence because there was "little, if any, possibility" under the Sentencing Guidelines that the defendant "would be sentenced to probation or anything close to probation." Id. Additionally, the defendant did not learn of his attorney's gross mischaracterization until he received the Presentence Report, after he pleaded guilty. Id. at 805–06. The district court ultimately determined, however, that the defendant could not withdraw his guilty plea because he did not prove actual prejudice. Id. at 806. The Ninth Circuit reversed and concluded that the district court applied the wrong legal standard by requiring the defendant to prove that his plea was invalid. Id. Relying heavily on the district court's finding that defense counsel affirmatively misrepresented to the defendant his likely sentencing range, the Ninth Circuit remanded to the district court to "decide anew" the motion to withdraw guilty plea using the correct legal standard. Id. at 807–08; see also Briggs, 623 F.3d at 728–29 (affirming the district court's denial of a motion to withdraw guilty plea when the defendant stated he expected a sentence in the range of 200 months imprisonment, but the presentence report calculated a guideline range of 360 months to life, because the defendant failed to substantiate his allegations of inadequate legal advice, and when he pleaded guilty, the defendant was aware that he faced a substantial term of incarceration).

Here, Mr. Wolff's representations to Defendant regarding his potential sentence, cannot be deemed a gross mischaracterization under Davis. Admittedly, the Court's determination of the applicable guideline range is particularly complex in this case. As noted, in Paragraph 12 the plea agreement, the parties specifically contested for purposes of sentencing whether the counts to which Defendant was not pleading guilty would constitute "relevant conduct" within the meaning of U.S.S.G. § 1B1.3. The parties each retained expert witnesses to testify as to this issue, and the Court bifurcated Defendant's sentencing so that, on the first day, it would hear the expert witness testimony regarding relevant conduct, and on the second day, it would sentence Defendant using the base offense level deemed applicable after the evidentiary hearing. (See Cr. No. 07-00299, Doc. # 148; Cr. No. 08-00128, Doc. # 110.) The Court finds, however, contrary to Defendant's assertion, that Mr. Wolff took great care to accurately explain to Defendant the possible permutations of the sentencing guidelines and how they might apply in Defendant's case. Mr. Wolff testified that he reviewed the sentencing guidelines with Defendant when discussing the plea agreement and that he sent Defendant a letter with tables talking about the potential application of the guidelines. Although Mr. Wolff admits that if the Court only considered Counts 9–12 of the Indictment, Defendant's base offense level would be 12, Mr. Wolff denies ever

52

telling Defendant that he would certainly receive this base offense level. The Court credits Mr. Wolff's testimony and is skeptical of Defendant's claim that he truly believed, when he pleaded guilty, that he would definitely have a base offense level of 12 at sentencing.[16]

Moreover, the Court has not yet determined what base offense level will apply in this case. Defendant relies heavily on the Probation Office's recent addendums to the Presentence Report, which conclude that Defendant's base offense level is 34. The Probation Office's determination of this issue, however, is irrelevant. The Court—not the Probation Office—will preside over Defendant's sentencing, and the Court will ultimately decide what constitutes relevant conduct. The Probation Office's decision on this point is premature, particularly because the Court cannot determine the actual base offense level until after it completes the evidentiary portion of Defendant's sentencing. Unlike Davis, where the district court would have had to depart downward twenty to thirty levels for the defendant to be sentenced in accordance with defense counsel's representation, see Davis, 428 F.3d at 805 n.2, here Mr. Wolff specifically negotiated for an evidentiary

---

[16] Indeed, the purpose of the evidentiary sentencing is to determine what base offense level will apply. Defendant's assertion that he believed he would not receive a base offense level higher than 12 is therefore illogical, especially because Mr. Wolff explained in detail how the sentencing guidelines could apply to Defendant's case.

sentencing to determine the base offense level that will apply.[17]  If Defendant

succeeds in arguing that the counts to which he did not plead guilty, and other

uncharged acts, are not relevant conduct, then only the counts to which Defendant

pleaded guilty will be incorporated into the base offense level.

Finally, Defendant's reliance on <u>United States v. Toothman</u>, 137 F.3d

1393 (9th Cir. 1998), is misplaced.  (<u>See</u> Supp. at 10.)  In <u>Toothman</u>, the defendant

believed that his guilty plea would invoke a guideline range of 10 to 16 months,

and the government and the district court confirmed this belief during the

defendant's change of plea hearing.  <u>Toothman</u>, 137 F.3d at 1399.  Thereafter, the

Presentence Report concluded that the underlying offense for the misdemeanor

civil rights violation, to which the defendant pleaded guilty, was felony criminal

sexual abuse.  <u>Id.</u> at 1397.  This resulted in a guideline range of 168 to 210 months,

and the defendant moved to withdraw his guilty plea as to the misdemeanor civil

rights violation.  <u>Id.</u>  The district court denied the defendant's motion and

ultimately sentenced the defendant to 109 months imprisonment.  <u>Id.</u> at 1397–98.

The Ninth Circuit reversed the district court's denial of the motion to withdraw

guilty plea because the defendant was misinformed by the court, government

---

[17] Mr. Wolff also testified that he and the Government went through more than one draft of the plea agreement and that he negotiated for Defendant to plead guilty to counts that would give rise to a lower base offense level.

counsel, and his own counsel, and led to believe that the basic guideline range would be 10 to 16 months.  Id. at 1400.

Here, as discussed, Defendant was not affirmatively misled into thinking that he would receive a base offense level of 12.  To the contrary, Mr. Wolff explained to Defendant that the guideline range would vary depending on the Court's determination regarding relevant conduct, and neither Judge Kobayashi nor the Government commented on what Defendant's guideline range would likely be during the Rule 11 hearing.  Although Defendant expressed slight confusion during the hearing about how the guideline range would be calculated, Judge Kobayashi discussed this topic with him on two separate occasions during the colloquy to rectify any misunderstanding.  The following two exchanges took place:

> JUDGE KOBAYASHI: Do you understand that if you plead guilty pursuant to this plea agreement you're going to give up any right to challenge or otherwise appeal the sentence imposed by Judge Ezra except in two limited circumstances.
>
> You would still have the right to appeal or file what's called a collateral attack on any sentence imposed by the Judge if he should make an upward departure, that is once your—your guideline range has been determined, if he should impose a sentence that's higher than that guideline range you would be able to appeal and/or collaterally attack that portion that's higher than the range.  And you would also retain your right for collateral review based on ineffective assistance of your attorney.

THE DEFENDANT: So based on 7(A), collateral attack, if it's more than 20 years; is that right?

JUDGE KOBAYASHI: Based on—

THE DEFENDANT: Page 3 of 14.

MR. WOLFF: That's not right.

THE DEFENDANT: That's not right.

JUDGE KOBAYASHI: That's not the one. No, it's—

THE DEFENDANT: Well, I thought that was the penalty.

MR. SHIPLEY: He's simply referring to the statutory maximum and confusing that with the guideline range.

THE DEFENDANT: Okay.

JUDGE KOBAYASHI: Oh, you're looking at the—the maximum. No, you know, once—your—your guideline range isn't going to be able to be determined until after the presentence report is prepared. Then there will be recommendations made by the—the Probation Officer—

THE DEFENDANT: Right.

JUDGE KOBAYASHI: —based on your criminal history and—and so forth.

THE DEFENDANT: The guideline ranges are made—recommended by the prosecution?

JUDGE KOBAYASHI: The guideline range is—is—the recommendation is made by the Probation Officer. That report would then be provided both to the prosecution and the defense. You'll both have an opportunity to read through that report, to make comments,

objections, corrections to the contents, and then you'll have an opportunity at the sentencing hearing to argue what—or your counsel will argue on behalf what is appropriate under the guideline sentencing—under the sentencing guidelines, and how it should be applied to you.

THE DEFENDANT: Okay.

JUDGE KOBAYASHI: All right. So what the Probation Officer comes up with in the recommendation in the presentence report isn't the final say. Each side gets an opportunity. The Government may disagree and may find that the guideline range should be higher than what the Probation Officer or what have you. So that—that all gets fleshed out after the report is completed, both sides got an opportunity for input and to make presentation at the sentencing hearing.

THE DEFENDANT: Okay.

JUDGE KOBAYASHI: But once the guideline range is determined, after all this information, and accepted by Judge Ezra if, and only if, he decides to sentence you to higher than that range you would still retain the right to appeal or otherwise challenge that portion. But, if he should sentence you entirely within the guideline sentence range, you would be waiving or giving up any right to appeal or otherwise challenge it based on this plea agreement; you understand that?

THE DEFENDANT: And the guideline range is calculated by the presentence report.

JUDGE KOBAYASHI: It would be initially calculated and recommended by the Probation Officer in the presentence report. So you're not going to know what it is until after the presentence report. I mean I'm sure you've had discussions with your lawyer. There's information you can gather from just the guidelines themselves.

MR. SHIPLEY: Your Honor, I think the one thing the Court hasn't said directly, and I think might answer the defendant's inquiry, is that it's Judge Ezra that determines—

JUDGE KOBAYASHI: Yes.

MR. SHIPLEY:—what the guideline range ultimately is.

JUDGE KOBAYASHI: Right.  I don't know—I thought I said that, but if I—if it's not clear, it's that the Probation Officer makes recommendations, the Government makes recommendations, defense will make recommendations.  Ultimately it's Judge Ezra who is going to determine what that guideline range is.

THE DEFENDANT: I see.

JUDGE KOBAYASHI: All right.  And by including the sentencing of the maximum that's to put you on notice what you—what's the maximum you would face.

THE DEFENDANT: Right.

JUDGE KOBAYASHI: All right.  But that might not necessarily be the guideline range.

THE DEFENDANT: It's still always advisory.

JUDGE KOBAYASHI: And it's advisory, right.  All right.  Did I answer your questions sufficiently?

THE DEFENDANT: Yeah, I'm still a little confused on what an appeal means to the guidelines, but that's okay.

JUDGE KOBAYASHI: All right.  Well—okay.  So—but you're giving up your right to appeal or challenge your sentence unless it's outside the guideline range or if it has to do with ineffective assistance of counsel.

THE DEFENDANT: Okay.

JUDGE KOBAYASHI: Okay.  So those are the only two areas that are carved out; you understand that?

THE DEFENDANT: Yeah.

MR. WOLFF: You need to answer verbally.

THE DEFENDANT: Yes, I understand that.

(July 10, 2009 Tr. at 13:5–25, 14–16, 17:1–7.)

JUDGE KOBAYASHI: Do you understand that Judge Ezra may be calculating your sentence based on guidelines that are issued by the United States Sentencing Commission?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: And you and Mr. Wolff, have you talked about the guidelines and how they may apply to you and your case?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: Okay. Before your guideline range can be determined, there has to be a presentence report that's prepared by the Probation Officer. In that presentence report, the Probation Officer will make a recommendation as to the application of the guidelines and will provide facts about you in the presentence report.

Both you and the Government will have an opportunity to read that report and to make any comments about the report[] and the recommendations of the Probation Officer and to file those comments or objections. Then you would be brought back to Court and appear before Judge Ezra and be able to make arguments to Judge Ezra. And any sentence that he imposes and findings that he makes might be different from any estimates that you and Mr. Wolff may have talked about. Do you understand this?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: Do you also understand that after your guideline range has been determined the Court has the authority to

depart from those guidelines and to impose a sentence that might higher or lower than the guideline range?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: Judge Ezra will also determine your sentence based on any admissions of fact that you make at today's hearing. So you don't have to admit to anything you disagree with the Government on, but if you do admit to certain facts he can rely on those admissions and as a result your sentence may be increased. Do you understand this?

THE DEFENDANT: Yes.

JUDGE KOBAYASHI: If the sentence is more severe than you expected you will still be bound by your plea. Even if you do not like the sentence imposed by the Court you won't be able to take back your guilty plea. So the time to make that decision is now; you understand this?

THE DEFENDANT: Yes.

(July 10, 2009 Tr. at 23:25, 24:1–25, 25:1–15 (emphases added).)

Defendant therefore acknowledged that the Court would determine the applicable guideline range and that any sentence imposed may be different from the estimates provided by Mr. Wolff. These under oath statements are consistent with the credible testimony offered by Mr. Wolff, outlined above. Although Defendant may not have possessed a trained lawyer's knowledge of the guidelines, he certainly understood how the guidelines applied to his case and how they operated. Moreover, as discussed infra, Judge Kobayashi informed Defendant,

during the Rule 11 hearing, of the statutory maximum sentence that could apply, and this information was also set forth in Paragraph 7 of the plea agreement. This, coupled with Judge Kobayashi's extensive discussion with Defendant regarding the applicability of the guidelines as well as Mr. Wolff's conversations with Defendant, would have necessarily resolved any doubts that Defendant harbored regarding his sentencing exposure in this case. See United States v. Mayweather, 634 F.3d 498, 506–07 (9th Cir. 2010) (concluding that the defendant's claim that he pleaded guilty under a mistaken belief as to his sentencing exposure was "'demonstrably false'" because the plea agreement correctly recited the statutory minimum and maximum sentences and the government recited this same minimum and maximum at the plea proceeding).

From this record, the Court simply cannot conclude that Defendant was misinformed as to his possible sentencing exposure. To the contrary, it appears that Defendant "only wanted to change his plea once he was face-to-face with the full consequences of his conduct." See id.; see also Nostratis, 321 F.3d at 1211 ("Defendants cannot plead guilty to 'test the weight of potential punishment' and then withdraw their plea if the sentence is 'unexpectedly severe.'") (citation omitted). Accordingly, Defendant's alleged mistaken belief about his sentencing

exposure cannot form a basis for granting Defendant's Motion to Withdraw Guilty Plea.

VI.     Adequacy of the Rule 11 Hearing—Supervised Release

Finally, Defendant asserts that Judge Kobayashi failed to advise him of the nature of supervised release during the plea colloquy and that this rendered his plea involuntary.  (Supp. at 10–12.)  Federal Rule of Criminal Procedure 11(b)(1)(H) provides that, before a court may accept a guilty plea, the court "must inform the defendant of, and determine that the defendant understands, . . . any maximum possible penalty, including imprisonment, fine, and term of supervised release."  Fed. R. Crim. P. 11(b)(1)(H).  "A failure to ensure that a defendant understands his range of exposure may violate the requirement that a guilty plea be 'knowing and voluntary.'"  United States v. Forrester, 616 F.3d 929, 938–39 (9th Cir. 2010) (citing Tanner v. McDaniel, 493 F.3d 1135, 1146 (9th Cir. 2007)).

Here, Defendant's contention that the Rule 11 colloquy was somehow inadequate, and failed to inform him of the potential term of supervised release, is factually unsupported and wholly contradicted by the record.  Judge Kobayashi advised Defendant during the colloquy as follows:

JUDGE KOBAYASHI: [W]ith regard to the offenses to which you would be pleading guilty, as to Counts 9 through 12 of the indictment, these charges carry with them a potential jail imprisonment from 0 to 20 years, a fine from zero to $1 million, plus a term of supervised release of at least three years and up to life.

As to Count 1 of the information in the Northern District of Alabama, that charge carries with it a potential jail imprisonment from zero to five years, and a fine from zero to $250,000, plus a term of supervised release of at least two years and up to life. That's as to Count 1 of the information.

. . . . Do you understand this?

THE DEFENDANT: Yes.

(July 10, 2009 Tr. at 17:8–25, 18:1–3.)

JUDGE KOBAYASHI: Each of the counts to which you are pleading guilty also require a period of supervised release. During a period of supervised release you must comply with a set of conditions. These will be explained to you by your Probation Officer. The conditions will include that you report to the Probation Officer, that you obey the law, and other requirements. If the Court finds that you violated the terms of your supervised release, while you were on supervised release, you could be ordered to serve additional prison time. Do you understand this?

THE DEFENDANT: Yes.

(July 10, 2009 Tr. at 22:18–25, 23:1–4.)

Judge Kobayashi therefore told Defendant of the potential term of supervised release, in accordance with Rule 11(b)(1)(H), and she also briefly described what supervised release entails as well as the potential consequences of

violating the conditions of supervision.  Defendant's arguments on this point, and

selective citation to the record, are therefore unpersuasive and belied by Judge

Kobayashi's dialogue during the plea colloquy.[18]  Accordingly, Defendant will not

be permitted to withdraw his guilty plea on this basis.

VII.    <u>Other Considerations</u>

Although Defendant has failed to show that his guilty plea was

involuntary or coerced, or that there is some other fair and just reason for its

withdrawal, the Court nonetheless briefly discusses two other relevant

considerations that bear on the merit of the instant motion.

---

[18] Defendant's reliance on <u>United States v. Thorne</u>, 153 F.3d 130 (4th Cir. 1998), is inapposite.  In that case, the district court failed to inform the defendant, during the Rule 11 hearing, that his sentence would include a term of supervised release, and the court also neglected to describe the nature of supervised release before accepting the guilty plea.  <u>Thorne</u>, 153 F.3d at 132–33.  The U.S. Court of Appeals for the Fourth Circuit reversed on the basis that this error affected the defendant's substantial rights.  <u>Id.</u> at 133–34.  Here, by contrast, Judge Kobayashi complied with both of these requirements—she informed Defendant during the Rule 11 colloquy of the applicable term of supervised release, and she also provided a brief overview regarding the meaning and effect of supervised release. Additionally, <u>Thorne</u> involved an earlier version of Rule 11, which required that the court inform the defendant of "the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole or supervised release term."  <u>Id.</u> at 133.  As discussed the current version of Rule 11 specifies that the court must inform the defendant of "any maximum possible penalty, including imprisonment, fine, and term of supervised release." Fed. R. Crim. P. 11(b)(1)(H).

A.    Defendant's Delay

A factor for the Court's consideration in ruling on the Motion to

Withdraw Guilty Plea is the context in which it arose, including Defendant's nearly

two-year delay in filing the instant motion.  "Delay itself does not make an

otherwise valid reason for withdrawal any less 'fair' or 'just,'" Garcia, 401 F.3d at

1013, and the Ninth Circuit has expressly declined to penalize defendants for their

delay in filing a motion to withdraw guilty plea when they presented either a

plausible explanation for the delay or a fair and just reason for withdrawal of the

guilty plea, see, e.g., McTiernan, 546 F.3d at 1169 (noting that the defendant's

seventeen-month delay in filing the motion to withdraw guilty plea was not

unreasonable when the motion was filed only two months after the defendant

retained new defense counsel and was first advised about the basis for the motion);

Garcia, 401 F.3d at 1013 (determining that the defendant's five-month delay in

filing the motion to withdraw guilty plea "should not [have been] count[ed] against

him" when the defendant presented newly discovered evidence of innocence and

there was no suggestion that the defendant's reasons for withdrawal were not bona

fide or that the government suffered great prejudice from the delay); Ortega-

Ascanio, 376 F.3d at 885–86 (reversing the district court's denial of a motion to

withdraw guilty plea when an intervening U.S. Supreme Court decision reversed

65

Ninth Circuit precedent and gave the defendant a plausible ground for dismissal of the indictment, and although the defendant waited nine months to file the motion to withdraw guilty plea, there was nothing to suggest that the new Supreme Court decision was not the basis for withdrawal). "[A] defendant's delay in moving to withdraw a plea [is nonetheless] a barometer of the defendant's candor with the court about his reasons for withdrawal." Garcia, 401 F.3d at 1013 (citations omitted); see also Nostratis, 321 F.3d at 1211 ("[T]he time between the plea and the plea withdrawal motion is a factor to consider in ruling on that motion."); United States v. Navarro-Flores, 628 F.2d 1178, 1184 (9th Cir. 1980) ("From the timing and circumstances of the application to withdraw the plea, the district court could reasonably have concluded that withdrawal was intended to serve a different purpose than that avowed by appellant." (citing United States v. Kay, 537 F.2d 1077, 1078 (9th Cir. 1976))).

Here, Defendant first moved to withdraw his guilty plea on January 5, 2010, six months after pleading guilty and two days before his sentencing. After withdrawing that motion and indicating that he wished to proceed with sentencing, Defendant filed the instant Motion to Withdraw Guilty Plea, nearly two years after pleading guilty and on the morning of his sentencing. The Ninth Circuit has rejected plea withdrawal motions where the delay was much shorter than the nearly

two-year delay present here.  See, e.g., Alber, 56 F.3d at 1111 (concluding that the

defendant's three-month delay in filing the motion to withdraw guilty plea

undermined his position that there had been a misunderstanding during his plea

hearing); Navarro-Flores, 628 F.2d at 1184 (rejecting a motion to withdraw guilty

plea made more than one month after the defendant entered his plea); see also

Nostratis, 321 F.3d at 1211 (concluding that the defendant's more than two-year

delay in filing the motion to withdraw guilty plea "suggest[ed] that the 'withdrawal

was intended to serve a different purpose than that avowed'" by the defendant,

particularly because the defendant "gave no reason why he waited so long to file

his plea withdrawal motion [and] did [not] contend on appeal that he lacked

competent counsel during the two years between his plea and his motion" (quoting

Navarro-Flores, 628 F.2d at 1184)).  Defendant's delay in filing the instant motion

is instructive as to the credence that should be afforded to his reasons for

withdrawal.  Although some of this delay is likely attributable to the withdrawal

and substitution of defense counsel, the procedural history of this case casts a

shadow over Defendant's motion and causes the Court to question Defendant's

motives, veracity, and stated desire to withdraw his guilty plea.  This is particularly

true because many, if not all, of Defendant's current bases for withdrawal are

expressly contradicted by the record, factually incorrect, or have already been the

subject of a prior motion to withdraw guilty plea.  On these facts, the Court simply
cannot rule out the possibility that Defendant has engaged in either an elaborate
attempt to manipulate the criminal justice system or a pattern to delay the ultimate
outcome of this case.[19]

B.    Defendant's Hawaii State Guilty Plea

Another relevant factor is Defendant's guilty plea to related state
charges.  On February 26, 2009, the State of Hawaii filed an Indictment charging
Defendant with two counts of Prohibited Acts Related to Controlled Substances, in
violation of H.R.S. § 329-41(a)(1).  Specifically, the Indictment asserts that
Defendant unlawfully distributed or dispensed controlled substances in the State of
Hawaii between October 5, 2005 and March 8, 2006 and on June 26, 2006.[20]  On

---

[19] Indeed, Defendant's sentencing is exceptionally difficult to schedule
because, not only do the Government, the Defendant, and the Court have to be
available, but the parties must also fly expert witnesses from the mainland to
Hawaii for the evidentiary portion of the sentencing.  Defendant's two motions to
withdraw guilty plea have caused considerable delay in the proceedings as well as
great inconvenience and expense.  When Defendant orally moved to withdraw his
guilty plea in January 2010, the Government's expert witness was already in transit
to Hawaii from the mainland.  When Defendant filed the instant motion, both the
Government's and Defendant's expert witnesses had already arrived from the
mainland.

[20] The Court takes judicial notice of both the Indictment and the plea
agreement in the State of Hawaii case because they are matters of public record.
See Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001) ("[U]nder Fed. R.
Evid. 201, a court may take judicial notice of 'matters of public record.'" (citation
omitted)).

March 31, 2010, eight months after Defendant's change of plea hearing in this case, Defendant pleaded guilty to both counts of this Indictment, pursuant to a plea agreement with the State.

On July 21, 2011, the Court ordered the parties to file supplemental briefing addressing the impact that Defendant's March 2010 state guilty plea has on Defendant's instant motion. (Cr. No. 07-00299, Doc. # 171; Cr. No. 08-00128, Doc. # 131.) On August 12, 2011, Defendant filed a Supplemental Memorandum in Support of Motion to Withdraw Guilty Plea. ("Def.'s Supp. Mem.," Cr. No. 07-00299, Doc. # 174; Cr. No. 08-00128, Doc. # 134.) The Government filed its Supplemental Memorandum in Opposition to Motion to Withdraw Guilty Plea on the same day. ("Gov.'s Supp. Mem.," Cr. No. 07-00299, Doc. # 173; Cr. No. 08-00128, Doc. # 133.)

Defendant asserts that the Hawaii state case, and his guilty plea therein, have no effect on the instant motion. In support of this argument, Defendant emphasizes that the state case is not a final judgment, and that it "has been continued on numerous occasions to trail the [f]ederal matter." (Def.'s Supp. Mem. at 2–3.) According to Defendant:

> The [s]tate case was continued on June 16, 2010; August 4, 2010; December 8, 2010; March 2, 2011; March 30, 2011; June 1, 2011; August 3, 2011; and August 10, 2011. The minutes of these hearings

on several occasions specifically reference the [f]ederal case as a basis for continuing the [s]tate matter.

(Id.)  Rather than support Defendant's argument, this fact demonstrates further motive for Defendant's delay in this case—every continuance herein postpones Defendant's sentencing in <u>both</u> this case and the state case.  Indeed, by impeding resolution of this action, Defendant can prolong final judgment on all of the outstanding criminal charges against him.  Defendant's assertion to the contrary is a nonstarter.

Defendant also contends that the state charges involve "what is believed to be facts that are separate and distinct than that which is pending in federal court."  (<u>Id.</u> at 3.)  Defendant does not elaborate upon this statement other than to say that, in the state case, "[t]he statute and allegations involve facts that are unrelated to the federal case and therefore should not be considered to be related or have any impact upon the federal case."  (<u>Id.</u>)  The Court disagrees.  First, even if the federal and state charges do not involve identical conduct, <u>i.e.</u> even if the state Indictment does not charge Defendant with distributing and dispensing controlled substances outside the usual course of professional medical practice and not for a legitimate medical purpose, these charges are nonetheless factually related because they all assert that the manner and method in which Defendant prescribed controlled substances was unlawful.  Second, the unlawful conduct underlying the

state and federal charges occurred at roughly the same time. As noted, the state case charges Defendant with conduct that took place between October 5, 2005 and March 8, 2006 and on June 26, 2006. The vast majority of the conduct charged in the 20-Count Indictment and the 2-Count Information took place during this time period as well.[21] The relevant time frame for the federal and state charges therefore overlaps significantly, which bolsters the conclusion that these charges are in fact similar. Finally, the fact that the state case "has been continued on numerous occasions to trail the [f]ederal matter" also shows that the federal and state charges are indeed related. If these matters were completely "separate and distinct" as Defendant suggests, the state court would have no reason to await judgment in this case before proceeding on the state charges.[22] Accordingly, the Court is not

---

[21] Fifteen counts in the 20-Count Indictment took place between October 5, 2005 and March 8, 2006, including the four counts to which Defendant pleaded guilty. The conduct charged in the 2-Count Information occurred between January 2004 and March 2006.

[22] The state plea agreement also explicitly mentions this case as follows:

In exchange for Defendant's plea and sentence, the State will agree that Defendant's sentence and term of imprisonment [will] run concurrent with the federal sentence that will be imposed in the federal case entitled U.S.A. v. Harold C. Spear, III, Cr. No. 07-00299.

If the state and federal proceedings truly are unrelated, it would make little sense for the state plea agreement to expressly mention this federal case.

persuaded by Defendant's argument that the state charges are unrelated to the federal charges.

Importantly, Defendant does not cite any authority, and the Court itself has found none, to indicate that the Court cannot consider the state guilty plea in its analysis of Defendant's motion. To the contrary, it is well-settled that the Court can consider "the timing and circumstances of the application to withdraw the plea." <u>Navarro-Flores</u>, 628 F.2d at 1184 (concluding that the district court could properly consider the defendant's one-month delay in filing his motion to withdraw guilty plea as well as the fact that the defendant only filed the motion after his codefendant was sentenced); <u>see also</u> <u>United States v. Vasquez-Velasco</u>, 471 F.2d 294, 294 (9th Cir. 1973) (per curiam) (determining that prejudice to the government is another relevant factor to be considered when ruling on a motion to withdraw guilty plea). Although not necessary for the Court's conclusion, and the Court would have denied the instant motion even without considering the state guilty plea, the state guilty plea nonetheless further undermines Defendant's credibility and demonstrates that perhaps the Motion to Withdraw Guilty Plea "was intended to serve a different purpose" than what Defendant asserts. <u>See</u> <u>Navarro-Flores</u>, 628 F.2d at 1184 (citing <u>United States v. Kay</u>, 537 F.2d 1077, 1078 (9th Cir. 1976)).

One of Defendant's primary arguments in favor of withdrawing his guilty plea is that he believed he was innocent, but Mr. Wolff coerced and pressured him into pleading guilty.  (Supp. at 9.)  When he pleaded guilty to the state charges, however, Defendant was represented by counsel other than Mr. Wolff.  If Defendant's federal guilty plea was truly the product of Mr. Wolff's coercion, Defendant would not have pleaded guilty to related state charges merely eight months later while represented by different counsel.  Not only does the state guilty plea undermine Defendant's claim that Mr. Wolff coerced him, but it also undercuts Defendant's argument that he believed he was not guilty and he never wanted to plead guilty.

Defendant's state guilty plea similarly weakens Defendant's assertion that he may have been suffering from impaired judgment when he pleaded guilty to the federal charges.  (Id. at 7–8.)  As discussed, this claim stems from Defendant's contention that he was not receiving the proper dose of lithium to control his bipolar disorder while he was at FDC.  Defendant was released from FDC on September 3, 2009, however, and Defendant pleaded guilty to the state charges on March 31, 2010.  There are no allegations that Defendant was manic or suffering from impaired judgment when he pleaded guilty to the state charges.  As noted, if Defendant had been suffering from impaired judgment during the change of plea

hearing in this case, he would have moved to withdraw his guilty plea upon his release from FDC, when his medication was purportedly better regulated. Instead, Defendant first moved to withdraw his guilty plea nearly six months after pleading guilty. Two months later, Defendant withdrew that motion to withdraw guilty plea and pleaded guilty to related state charges. Now, nearly two years after pleading guilty to the federal charges, and fourteen months after pleading guilty to the state charges, Defendant once again attempts to withdraw his federal guilty plea on the basis that he may have been suffering from impaired judgment when he pleaded guilty. This sequence of events seriously calls into question the veracity of Defendant's claim that he could have been suffering from a manic episode when he pleaded guilty to the federal charges.

Additionally, Defendant offers no explanation for his decision to plead guilty to the state charges other than to claim that these charges are "separate and distinct" from the federal charges and to assert that he plans to file a motion to withdraw his state guilty plea. Defendant also states that he has been represented by at least five different attorneys in the state case. These assertions do not account for the inconsistencies between Defendant's bases for withdrawing his federal plea and his subsequent decision to plead guilty to related state charges. Nor does Defendant attempt to reconcile these inconsistencies. The Court

therefore concludes that Defendant's state guilty plea, entered eight months after the change of plea hearing in this case, further calls into question Defendant's credibility and the motives for attempting to withdraw his guilty plea in this action.

In sum, Defendant was clearly ambivalent at one point about entering a guilty plea, but that ambivalence led to a firm conviction to plead guilty. Although the Court acknowledges Defendant's mental and emotional issues, Dr. Kemble could not testify with any reasonable degree of medical certainty that Defendant was suffering from impaired judgment and functioning when he entered his guilty plea. Moreover, the Court finds that Mr. Wolff did explain to Defendant his option to proceed to trial, adequately explained the sentencing guidelines to Defendant, and that Defendant had a sufficient understanding of the plea agreement such that his plea was not coerced, but voluntary. Nothing has changed since Defendant entered his plea two years ago—there has been no newly discovered evidence or intervening change in the law or circumstances that would justify withdrawal of the guilty plea in this case. Based on a review of the entire record, including Defendant's testimony, the Court is left with a firm conviction that Defendant has simply had a change of heart, an insufficient basis to permit a withdrawal of the plea. The Court takes seriously Defendant's motion, but in

assessing the credibility of the witnesses, and weighing all the appropriate factors, the Court finds without reservation that Defendant's Motion to Withdraw Guilty Plea should be DENIED.

## CONCLUSION

For the reasons stated above, and after careful review, the Court DENIES Defendant's Motion to Withdraw Guilty Plea. (Cr. No. 07-00299, Doc. # 156; Cr. No. 08-00128, Doc. # 117.) Defendant shall appear before the Court for sentencing as directed.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 24, 2011.

_____
David Alan Ezra
United States District Judge

United States v. Harold C. Spear, III, M.D., Cr. Nos. 07-00299 DAE, 08-00128 DAE; ORDER DENYING DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA